## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| DREW MATEYA, individually and as representative of a class of similarly situated persons of, and on behalf of, the Cook Group 401(k) Plan,<br><br>      Plaintiff,<br><br>v.<br><br>COOK GROUP INCORPORATED, COOK GROUP INC. PROFIT SHARING PLAN, COOK GROUP PROFIT SHARING PLAN ADVISORY COMMITTEE, JOHN R. KAMSTRA, ROBERT L. SANTA, GREGORY S. SMITH, and TEDD GREEN,<br><br>      Defendants. | CASE NO. 1:22-cv-1271<br><br><br><br><br><br>**CLASS ACTION**<br><br>**JURY DEMANDED** |

## CLASS ACTION COMPLAINT

1.     Plaintiff, Drew Mateya, individually and as representative of a class of participants and beneficiaries in the Cook Group Inc. Profit Sharing Plan (the "Plan"), brings this action under 29 U.S.C. §§ 1132(a)(2) & (3) on behalf of the Plan against Defendants Cook Group Incorporated, Cook Group Profit Sharing Plan, Cook Group Profit Sharing Plan Advisory Committee, John R. Kamstra, Robert L. Santa, Gregory S. Smith, and Tedd Green (collectively, "Defendants"), for breach of fiduciary duties.

2.     Today, 401(k) defined-contribution plans, in which the employees' retirement assets are at risk of high fees and underperformance, have become

1

America's primary retirement system, departing from traditional defined-benefit (pension) plans where the employer assumes the risk.[1]

3.    The marketplace for 401(k) retirement plan services is established and competitive.

4.    Billion-dollar defined-contribution plans, like the Plan, have tremendous bargaining power to demand low-cost administrative and investment management services.

5.    As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of participants and beneficiaries and ensure that Plan expenses are reasonable.

6.    These duties are the "highest known to the law" and must be performed with "an eye single to the interests of the participants and beneficiaries." *Davis v. Richards*, 7 F.4th 534, 546 (7th Cir. 2021).

7.    The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting investments, as well as a continuing duty to monitor fees and expenses of selected investments and remove imprudent ones. *Tibble v. Edison Int'l*, 574 U.S. 523, 529 (2015); 29 U.S.C. § 1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the Plan"); 29 C.F.R. § 2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment.").

---

[1]  Nancy Trejos, *Retirement Wreck,* WASHINGTON POST (Oct. 12, 2008), available at http://www.washingtonpost.com/wp-dyn/content/article/2008/10/11/AR2008101100177.html (last visited June 27, 2022).

8.      "ERISA's essential remedial purpose [is] to protect the beneficiaries of private pension plans." *Nachwalter v. Christie*, 805 F.2d 956, 962 (11th Cir. 1986) (citing *Dennard v. Richards Grp., Inc.*, 681 F.2d 306, 319 (5th Cir. 1982)); *accord Sokol v. Bernstein*, 812 F.2d 559, 560 (9th Cir. 1987).

9.      It is for good reason that ERISA requires fiduciaries to be cost-conscious:

> Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan," by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.

*Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019) (quoting *Tibble*, 574 U.S. at 529).

10.     Plaintiff alleges that during the putative Class Period (six years prior to the date this action was first commenced through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA, 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiff, and to the other Participants of the Plan by, among other things: (1) authorizing the Plan to pay objectively unreasonable fees for recordkeeping and administration ("RK&A Fees"); (2) failing to objectively, reasonably, and adequately review the Plan's investment portfolio with due care to ensure that each investment share class was prudent, in terms of costs; and (3) maintaining certain funds in the Plan despite the availability of materially identical or substantially similar investment share classes or funds with lower costs.

11.    Instead of using the Plan's bargaining power to benefit participants and beneficiaries, Defendants selected and retained high-cost investments and agreed to excessively high compensation for recordkeeping, administration, and/or other fees compared to available alternatives and caused the Plan, and hence participants, to pay unreasonable expenses and costs for the Plan.

12.    These objectively unreasonable RK&A Fees, share-class selections, and high-cost investments cannot be justified.

13.    Defendants' failures breached the fiduciary duties they owed to Plaintiff, Plan Participants, and beneficiaries.

14.    Prudent fiduciaries of 401(k) Plans continuously monitor fees against applicable benchmarks and peer groups to identify objectively unreasonable and unjustifiable fees.

15.    Upon information and belief, Defendants engaged in a flawed and imprudent decision-making and selection process by not subjecting its recordkeeper, Fidelity Investments, to a competitive, recordkeeper bidding process during the Class Period and by maintaining objectively unreasonable share classes and funds in their investment portfolio when cheaper share classes and funds with comparable or even materially identical portfolio management and investments were readily available.

16.    To remedy these fiduciary breaches, Plaintiff, individually and as representative of a class of participants and beneficiaries in the Plan, brings this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) & (3) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses

4

resulting from each breach of fiduciary duty and restore to the Plan any profits made through Defendants' use of the Plan's assets.

17.     In addition, Plaintiff seeks to reform the Plan to comply with ERISA and to prevent further breaches of ERISA's fiduciary duties and other such equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

18.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) & (3), for which federal district courts have exclusive jurisdiction under 29 U.S.C. § 1132(e)(1).

19.     This Court has personal jurisdiction over Defendants because they transact business in this district, reside in this district, and have significant contacts with this district, and because ERISA provides for nationwide service of process.

20.     This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the subject Plan is administered, where at least one of the alleged breaches took place, and where the Defendants may be found. Defendants are subject to nationwide service of process under 29 U.S.C. § 1132(e)(2).

21.     In conformity with 29 U.S.C. § 1132(h), Plaintiff served the original Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

### Cook Group 401(k) Plan

22.     The Plan is a defined-contribution, individual-account, employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34).

23.     The Plan was established by Defendant Cook Group Incorporated ("Cook Group") and is maintained under a written document in accordance with 29 U.S.C. § 1102(a).

24.     The Plan provides for retirement income for Cook Group employees.

25.     That retirement income depends on contributions made on behalf of each employee by his or her employer, deferrals of employee compensation and employer matching contributions, and on the performance of investment options net of fees and expenses exclusively controlled by the fiduciaries of the Plan.

26.     Cook Group established a trust to hold participant and employer contributions and such other earnings, income, and appreciation from Plan investments less payments made by the Plan's trustee to carry out the purposes of the trust and Plan in accordance with 29 U.S.C. § 1103(a).

27.     As of September 30, 2021, the Plan had more than $1.19 billion in total assets and approximately 12,300 participants.

### Plaintiff

28.     Drew Mateya is a participant in the Plan under 29 U.S.C. § 1002(7) because he is or may become eligible to receive a benefit under the Plan, or his beneficiaries may be eligible to receive any such benefit.

29.     Plaintiff has Article III standing to bring this action on behalf of the Plan because he suffered an actual injury to his own Plan account in which he is still a Participant, that injury is fairly traceable to Defendants' unlawful conduct, and the harm is likely to be redressed by a favorable judgment. *See* 29 U.S.C. § 1132; *see, e.g.*, *Cutrone v. Allstate Corp.*, No. 20 CV 6463, 2021 U.S. Dist. LEXIS 185430, at *13–19, 2021 WL 4439415 (N.D. Ill. Sep. 28, 2021);.

30.     Plaintiff and all Participants in the Plan suffered ongoing financial harm as a result of Defendants' continued imprudent and unreasonable investment and fee decisions made with regard to the Plan.

31.     Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the RK&A Fees, investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized Plans, total cost comparisons to similarly-sized Plans, and information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

32.     Plaintiff and all participants in the Plan, having never managed a large 401(k) Plan such as the Plan, lacked actual knowledge of reasonable-fee levels and prudent alternatives available to such Plans.

## Defendants

33.    Cook Group is a for-profit domestic corporation organized under Indiana law with its principal place of business in Bloomington, Indiana.

34.    Cook Group is a global, family-owned group of businesses spanning medical devices, life sciences, services, property management, and resorts. Cook Group Incorporated is the Plan Sponsor and Plan Administrator under 29 U.S.C. § 1002(16)(A)(i) and (B)(i). *See* Part 2a and 3a of the Plan's Form 5500 for 2019.

35.    Cook Group, as the Plan Administrator, appointed the Profit Sharing Plan Advisory Committee to administer the Plan.

36.    The Profit Sharing Plan Advisory Committee is comprised of John R. Kamstra, Robert L. Santa, Gregory S. Smith, and Tedd Green.

37.    As the members of the Profit Sharing Plan Advisory Committee, John R. Kamstra, Robert L. Santa, Gregory S. Smith, and Tedd Green each owed fiduciary duties to the Plan and the Plan participants.

## FACTS APPLICABLE TO ALL COUNTS

### Defined-Contribution Plan Industry

38.    In a defined-contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan, less expenses. *See* 29 U.S.C. § 1002(34).

39.    Accordingly, poor investment performance and unreasonable fees can significantly impair the value of a participant's account.

40.     Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. *See*, *e.g.*, U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Sept. 2019) (illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).[2]

41.     Over the past three decades, defined-contribution plans have become the most common employer-sponsored retirement plan.

42.     A defined-contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan.

43.     Among many options, employers may make contributions on behalf of all employees and/or make matching contributions based on the employees' elective deferrals. Employees with money in a plan are referred to as "participants."

44.     Recordkeeping and related administrative ("RK&A") services are necessary for all defined contribution plans.

45.     These services include, but are not limited to, those related to maintaining plan records, tracking participant account balances and investment elections, transaction processing, call center support, participant communications, and trust and custody services.

46.     Defendants received a standard package of RK&A services.

47.     Third-party service providers, often known as "recordkeepers," provide RK&A services on behalf of a defined-contribution plan.

---

[2]     Available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited June 27, 2022).

48.    Some recordkeepers provide only recordkeeping and related services and some recordkeepers are subsidiaries of financial services and insurance companies that distribute mutual funds, insurance products, and other investment options.

49.    The market for defined-contribution recordkeeping services is highly competitive, particularly for a plan like the Plan with large numbers of participants and large amounts of assets.

50.    Since at least the mid-2000s, the fee that RK&A service providers have been willing to accept for providing RK&A services has decreased.

51.    The underlying cost to a recordkeeper of providing the RK&A services to a defined-contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.

52.    The incremental cost for a recordkeeper to provide RK&A services for a participant's account does not materially differ from one participant to another and is generally not dependent on the balance of the participant's account.

53.    Recordkeepers for relatively large defined-contribution plans, like the Plan here, experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increases, because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low.

54.    These economies of scale are inherent in all recordkeeping arrangements for defined-contribution plans.

55.    When the number of participants with an account balance increases in

a defined-contribution plan, the recordkeeper can spread the cost of providing recordkeeping services over a larger participant base, thereby reducing the unit cost of delivering services on a per-participant basis.

56.     Therefore, while the total cost to a provider for RK&A services increases as more participants join the Plan, the cost per participant to deliver the services decreases.

57.     Since at least the early 2000s, plan fiduciaries and their consultants and advisors have been aware of this cost-structure dynamic for RK&A providers.

58.     Since at least the early 2000s, Defendants should have been aware of this cost-structure dynamic for RK&A providers.

59.     Sponsors of defined-contribution plans contract for RK&A services separately from any contracts related to the provision of investment management services to plan participants.

60.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping services that the recordkeeper provides on behalf of the investment manager, *e.g.*, RK&A services.

61.     As a result, RK&A service providers often make separate contractual arrangements with mutual fund providers.

62.     For example, RK&A providers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund.

63.     These fees are known in the defined-contribution industry as "revenue

sharing."

64.     For example, if a mutual fund has a total expense ratio fee of 0.75%, the mutual fund provider may agree to pay the RK&A provider 0.25% of the 0.75% total expense ratio fee that is paid by the investor in that mutual fund (in this context the Plan Participant).

65.     That 0.25% portion of the 0.75% total expense ratio fee is known as the "revenue sharing."

66.     In the context of defined-contribution plans, the amount of revenue sharing is deemed to be the amount of revenue paid by participants that is allocable to RK&A services and, in some cases, other services provided to the Plan.

67.     The difference between the total expense ratio and the revenue sharing is known as the "Net Investment Expense to Retirement Plans."

68.     In the context of defined-contribution plans, when a plan adopts prudent and best practices, the Net Investment Expense to Retirement Plans is the actual amount a plan participant pays for the investment management services provided by a portfolio manager.

69.     In the context of defined-contribution plans, when multiple share classes of a mutual fund are available to a retirement plan, the share class that provides the lowest Net Investment Expense to Retirement Plans is often referred to as the "Most Efficient Share Class."

70.     Providers of Retirement Plan Services, including RK&A services, typically collect their fees through direct payments from the plan or through indirect

compensation such as revenue sharing, or some combination of both.

71.     Regardless of the pricing structure that the Plan Fiduciary negotiates with the recordkeeper, the amount of compensation paid to the recordkeeper for the RK&A services must be reasonable.

72.     As a result, plan Fiduciaries must understand the total dollar amounts paid to their RK&A provider and be able to determine whether the compensation is reasonable by understanding what the market is for the RK&A services received by the Plan.

73.     Because RK&A fees are actually paid in dollars and because of the cost dynamic outlined above, the fees paid for RK&A services are evaluated and compared on a dollar-per-participant basis.

74.     It is well known among retirement-plan consultants and advisors (who often act as co-fiduciaries to the plan fiduciaries) that, all else being equal, a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis.

75.     During the Class Period, Defendants knew and/or were aware that a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis.

76.     During the Class Period, Defendants knew and/or were aware that the Plan should have received a lower effective per-participant fee when evaluated on a per-participant basis.

77.     Plan fiduciaries of a defined-contribution plan have a continuing and

regular responsibility to select and monitor all investment options they make available to plan participants. *Tibble*, 575 U.S. at 530.

78.   The primary purpose in selecting plan investments is to give all participants the opportunity to create an appropriate asset allocation under modern portfolio theory by providing diversified investment alternatives. *See* 29 C.F.R. § 2550.404c-1(b)(3).

79.   In selecting different investment options to make available to plan participants, the plan fiduciaries are held to the prudent-investor standard when choosing investment managers or, alternatively, choosing index investment options. 29 U.S.C. § 1104(a)(1).

80.   When choosing an active investment option, the analysis is focused on determining whether the portfolio manager is likely to outperform an appropriate benchmark.

81.   Accordingly, the primary focus when choosing an active investment option to make available to plan participants is the skill of the portfolio manager.

82.   In many cases, a plan sponsor can receive the investment management services of the same portfolio manager through different share classes.

83.   When the same investment management services are provided through a mutual fund with different share classes, the fee paid to the portfolio manager is the same for all share classes.

84.   The difference in the share class fees is the amount of additional fees which can be used to pay for, among other things, RK&A services.

85. As a result, when a prudent plan fiduciary can select from among several alternative share classes of the materially identical investment option, the prudent plan fiduciary selects the share class that provides the lowest Net Investment Management Expense to Retirement Plans.

### ERISA'S FIDUCIARY STANDARDS AND STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING INVESTMENT OPTIONS

86. ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan. *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016); Delker v. Mastercard Int'l, Inc., 21 F.4th 1019 (8th Cir. 2022) ("ERISA imposes upon fiduciaries twin duties of loyalty and prudence." (cleaned up)).

87. 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries and –
> (A) for the exclusive purpose of:
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the Plan; [and]
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and like aims.

88. With certain exceptions, 29 U.S.C. §1103(c)(1) provides in relevant part:

> [T]he assets of a Plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan.

89. 29 U.S.C. §1109 provides in relevant part:

15

> Any person who is a fiduciary with respect to a Plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such Plan any losses to the Plan resulting from each such breach, and to restore to such Plan any profits of such fiduciary which have been made through use of assets of the Plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

90.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

91.     Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. Dep't of Labor Adv. Op. 97-15A; Dep't of Labor Adv. Op. 97-16A; *see also* 29 U.S.C. § 1103(c)(1) (Plan assets "shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan").

92.     ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants. *Davis*, 7 F.4th at 546.

93.     "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.,* 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros v. Cody*, 744 F.2d 270, 279 (2nd Cir. 1984) (fiduciaries must use "the appropriate methods to investigate the merits" of Plan investments).

94.     Fiduciaries must "initially determine, and continue to monitor, the

16

prudence of each investment option available to plan participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); 29 C.F.R. § 2550.404a-1; Dep't of Labor Adv. Op. 98-04A; Dep't of Labor Adv. Op. 88-16A.

95. Thus, a defined-contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009).

96. Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 673 U.S. at 530.

97. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act § 7.

98. An investment policy statement or IPS is a governing plan document within the meaning of 29 U.S.C. § 1104(a)(1)(D).

99. "Fiduciaries who are responsible for plan investments governed by ERISA must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1042 (9th Cir. 2001).

100. "[F]ailure to follow written statements of investment policy constitutes a breach of fiduciary duty." *Id.* (citing *Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1241–42 (2d Cir. 1989)).

101.   A violation of investment guidelines is an independent breach of fiduciary duty, regardless of whether the action was otherwise prudent. *See* 29 U.S.C. § 1104(a)(1)(D).

102.   ERISA also imposes explicit co-fiduciary liability on plan fiduciaries. 29 U.S.C. § 1105(a) provides for fiduciary liability for a co-fiduciary's breach:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
> (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

103.   29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.

104.   29 U.S.C. § 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

105.   A plan fiduciary is required to fully understand all sources of revenue received by its RK&A service provider/recordkeeper.

106.   A plan fiduciary must regularly monitor that revenue to ensure that the compensation received by the recordkeeper is and remains reasonable for the services provided. *Henderson v. Emory Univ.*, 252 F. Supp.3d 1344, 1353 (N.D. Ga. 2017); *Bell v. Pension Comm. of ATH Holding Co.*, No. 1:15-cv-02062-TWP-MPB, 63 Employee Benefits Cas. (BNA) 1502, 2017 U.S. Dist. LEXIS 42107, at *11–*14, 2017 WL 1091248 (S.D. Ind. Mar. 23, 2017)

107.   Prudent plan fiduciaries ensure they are paying only reasonable fees for RK&A services by soliciting competitive bids from other service providers to perform the same services currently being provided to the plan. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 798–800 (7th Cir. 2011); *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1064–65 (M.D. Tenn. 2018).

108.   This is not a difficult or complex process and is performed regularly by prudent plan fiduciaries.

109.   Plan fiduciaries need only request a bid from salespeople at other service providers.

110.   For plans with as many participants as the Plan, most recordkeepers require only the number of participants and the amount of the assets to provide a quote, while others only require the number of participants.

111.   Prudent plan fiduciaries have all of this information readily available and can easily receive a quote from other service providers to determine if the current level of fees is reasonable.

112.   Having received bids, the prudent plan fiduciary can negotiate with its

current provider for a lower fee and/or move to a new provider to provide the same (or better) services for a competitive reasonable fee.

113.   Prudent plan fiduciaries follow this same process to monitor the fees of retirement plan advisors and/or consultants as well as any other covered service providers.

114.   After the revenue requirement is negotiated, the plan fiduciary determines how to pay the negotiated RK&A fee.

115.   The employer/plan sponsor can pay the recordkeeping fee on behalf of participants, which is the most beneficial to plan participants.

116.   If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable recordkeeper would accept.

117.   Usually, however, the employer decides to have the plan (i.e. the plan participants) pay the recordkeeping fee instead.

118.   If the recordkeeping fee is paid by the plan (i.e. plan participants), the plan fiduciary can allocate the negotiated recordkeeping fee among participant accounts at the negotiated per-participant rate, or pro-rata based on account values, among other less-common ways.

119.   In other words, if a plan negotiates a per-participant revenue threshold, *e.g.*, $45.00, the plan does not need to require that each participant pay $45.00.

120.   Rather, the plan fiduciary could determine that an asset-based fee is more appropriate for plan participants and allocate the RK&A fee pro rata to participants.

121.    For example, a 10,000-participant plan with a $45.00 revenue threshold would pay $450,000 for RK&A services.

122.    If the plan had $450,000,000 in assets, then the $450,000 would work out to 10 basis points.

123.    Accordingly, the plan fiduciary could allocate the $450,000 to plan participants by requiring that each participant pay 10 basis points.

124.    In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the plan.

125.    This structure creates situations in which the RK&A services provided by the recordkeeper do not change but, because of market appreciation and contributions to the plan, the revenue received by the recordkeeper increases.

126.    This structure was historically preferred by recordkeepers because it allowed recordkeepers to obtain an increase in revenue without having to ask the client to pay a higher fee.

127.    Regardless of the pricing structure negotiated by the plan fiduciary, the plan fiduciary must ensure that the fee paid to the recordkeeper for RK&A services is reasonable for the level of services provided.

128.    All of these standards were accepted and understood by prudent plan fiduciaries, including Defendants, at all times during the Class Period.

129.    For example, fiduciary best practices based on DOL guidelines, caselaw, and marketplace experience are as follows:

1. Price administrative fees on a per-participant basis.
2. Benchmark and negotiate recordkeeping and investment fees separately.
3. Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.
4. Benchmark and negotiate recordkeeping and trustee fees at least every other year.

\* \* \* \* \*

7. Review services annually to identify opportunities to reduce administrative costs.[3]

130.   Defendants' recordkeeper during the Class Period, Fidelity Investments, is a well-known provider of RK&A services.

131.   Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.,* 746 F.3d 327, 336 (8th Cir. 2014) (holding that fiduciaries of a 401(k) Plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the Plan); *George*, 641 F.3d at 800 (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

132.   First, a plan fiduciary must pay close attention to the recordkeeping fees being paid by the plan.

133.   A hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship

---

[3]  "Fiduciary Best Practices," *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer Investment Consulting (2013), available at https://www.mercer.com/content/dam/mercer/attachments/global/Retirement/DC%20Fee%20Management%20-%20Mitigating%20Fiduciary%20Risk%20and%20Maximizing%20Plan%20Performance.pdf (last visited June 27, 2022).

pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

134.    Second, to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent hypothetical fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

135.    To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

136.    Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.

137.    This will generally include conducting a request for proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.

138.    More specifically, an RFP should happen at least every three (3) years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans.

139.    That said, conducting an RFP is not required to determine a reasonable

RK&A fee.

140.   By merely soliciting bids from other providers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for similar RK&A services and have an idea of a starting point for negotiation.

141.   Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids through some process. *See George*, 641 F.3d at 800 (401(k) excessive fee case which denied summary judgment based in part on the opinion of an independent consultant that "'without an actual fee quote comparison'— i.e., a bid from another service provider—[consultant] 'could not comment on the competitiveness of [recordkeeper's] fee amount for the services provided.'").

142.   For all practical purposes there is a commonly accepted process to select and monitor investment options which is based on modern portfolio theory and the prudent investor standard.

143.   Under ERISA, plan fiduciaries are required to engage investment consultants or advisors to the extent that the plan Fiduciaries do not have the investment expertise necessary to select and monitor investments under modern portfolio theory.

144.   That accepted process involves, among other things, evaluating the performance history, tenure, and stability of the current portfolio manager; the risk adjusted returns; and the fees.

145.   When an active investment option is chosen, one of the most critical aspects of the analysis is to choose a portfolio manager because it is the skill of the

portfolio manager that differentially impacts the performance of the investment.

146.    From the perspective of a plan participant, the other critical component of the analysis is the fees.

147.    However, the total expense ratio of an investment option is often comprised of multiple layers of fees, only one of which is specifically associated with the fee of the actual portfolio manager.

148.    As a result, a plan fiduciary is required to understand the interrelationship between the pricing structure it has negotiated with the recordkeeper for RK&A services as well as the different fee components of the investment options selected to be made available to plan participants.

149.    Plan fiduciaries of plans as large as the Plan are deemed to be "institutional investors" and are deemed to have a higher level of knowledge and understanding of the different investment share classes and the different components of fees within the total expense ratio of an investment option.

150.    In fact, as institutional investors, retirement plans often have the ability to access investment options and service structures that are not available or understood by retail investors such as individual plan participants, like Plaintiff.

151.    For example, minimum investment requirements and other fees or restrictions are routinely waived for large retirement plans.

152.    As a result, when a plan fiduciary can choose among different share classes (or other types of investment options, e.g., collective trusts) to receive the services of a specific portfolio manager, the plan fiduciary is required to understand

all the fees related to the different share classes and choose the share class that is in the best interest of the plan participants.

153.   This is especially critical when the pricing structure provides compensation to the recordkeeper from revenue sharing paid by plan participants as part of the total expense ratio of the investment options selected by the plan fiduciaries.

154.   If a plan fiduciary chooses an active investment option when an alternative index option is available, the plan fiduciary must make a specific and informed finding that the probability that the active portfolio manager will outperform the index warrants the higher fees charged by the active portfolio manager and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of plan participants.

155.   It is not enough to simply observe that an active investment option could outperform another active or passive option; there must be a prudent process to determine if that is likely to happen.

156.   If a plan fiduciary chooses an active investment option when an alternative index option is available, but the plan fiduciary does not make a specific and informed finding that the probability that the active portfolio manager will outperform the index (and warranting the higher fees charged by the active portfolio manager) and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of plan participants, the plan fiduciary has acted unreasonably and/or imprudently.

## THE PLAN

157.   At all relevant times, the Plan's fees were excessive when compared with other comparable 401(k) plans offered by other sponsors that had similar numbers of plan participants, and similar amounts of money under management.

158.   The fees were also excessive relative to the RK&A services received.

159.   These excessive fees led to lower net returns than participants in comparable 401(k) plans enjoyed.

160.   Defendants controlled the investment options in which the participants could invest their retirement assets.

161.   As of September 30, 2021, Defendants provided 31 investment options:

| Investment Options | Assets as of 9/30/2021 |
|---|---|
| FID GROWTH CO K6 | $   169,196,407 |
| AF TRGT DATE 2030 R6 | $   109,165,387 |
| AF TRGT DATE 2040 R6 | $   92,833,783 |
| AF TRGT DATE 2045 R6 | $   74,785,463 |
| AF TRGT DATE 2050 R6 | $   72,433,282 |
| AF TRGT DATE 2035 R6 | $   66,368,117 |
| FID 500 INDEX | $   60,039,369 |
| PIM TOTAL RT INST | $   57,582,804 |
| AF TRGT DATE 2025 R6 | $   57,345,790 |
| COL DIVIDEND INC I | $   52,200,549 |
| AF TRGT DATE 2020 R6 | $   51,534,854 |
| NYL GUAR INT ACCOUNT | $   50,029,652 |
| AF EUROPAC GROWTH R6 | $   47,447,260 |
| AF FUNDMNTL INV R6 | $   38,229,850 |
| AF TRGT DATE 2055 R6 | $   37,508,925 |
| FID LOW-PRICED ST K6 | $   22,410,998 |
| FID PURITAN K | $   22,062,076 |
| AF TRGT DATE 2060 R6 | $   19,252,845 |
| FID MID CAP IDX | $   12,273,018 |
| FID SMALL CAP GR K6 | $   12,094,516 |
| FID SM CAP IDX | $   11,084,191 |

| | |
|---|---:|
| AF TRGT DATE 2010 R6 | $ 10,793,160 |
| VANG STRATEGIC EQ | $ 10,388,396 |
| UM BEHAVIORAL VAL R6 | $ 8,249,577 |
| AF TRGT DATE 2015 R6 | $ 7,488,075 |
| BLKRK STR INC OPP IS | $ 5,339,290 |
| VANGUARD LS GROWTH | $ 4,391,358 |
| VANGUARD LS INCOME | $ 3,155,360 |
| FID FREEDOM INC K | $ 2,841,432 |
| VAN LS CONSERV GRTH | $ 2,797,413 |
| VAN LS MODERATE GRTH | $ 1,882,276 |
| **INVESTMENT TOTALS** | $ 1,193,205,473 |

**Unreasonable Investment Management
Fees from Excessively High-Priced Investment Options**

162.   Academic and financial industry literature shows the importance of low fees in selecting investments.

163.   Numerous scholars have demonstrated that high expenses are not correlated with superior investment management.

164.   Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2009); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

28

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

165.   Even if an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997) (measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns").

166.   However, the *worst- performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

167.   To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. Fin. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin. 1655, 1690 (2000).

168.   Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost, actively managed funds without a documented process to realistically conclude that the fund

is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses.

169.   Rather than taking advantage of the Plan's economies of scale to reduce the investment expenses charged to Plan participants, Defendants selected and maintained high-priced share classes of mutual funds, instead of *materially identical* lower-cost share classes of those same mutual funds which were readily available to the Plan.

170.   Defendants also failed to adequately investigate and offer non-mutual fund alternatives, such as collective trusts and separately managed accounts, to further reduce the investment expenses charged to Plan participants.

171.   Holders of large pools of assets know that these investment vehicles are readily available to them and can be used for the same investment style and with the same portfolio manager, but are much less expensive.

172.   Each mutual fund in the Plan charged fees far in excess of the rates Defendants could have obtained for the Plan by using these comparable products.

173.   It is a simple principle of investment management that the larger the size of an investor's available assets, the lower the investment management fees as a percentage of assets that the investor can obtain in the market.

174.   Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.

175.   Generally, more expensive shares are targeted at small investors with less bargaining power, while lower cost shares are targeted at larger investors with

greater assets.

176.    There is no material difference between share classes other than costs—the funds hold materially identical investments and have the same portfolio manager.

177.    Thus, large retirement plans have substantial bargaining power to negotiate lower fees for investment management services.

178.    Jumbo retirement plans, such as the Plan, have much more bargaining power to negotiate lower fees for investment management services than even large plans.

179.    Lower-cost institutional share classes of mutual funds compared to high-priced retail shares are readily available to institutional investors, like the Plan, or even smaller asset holders, that meet minimum investment amounts for these share classes.

180.    So, unlike individual or retail investors, retirement plan fiduciaries often have access to several different share classes.

181.    A prudent plan fiduciary ensures that the plan selects the share class that provides the greatest benefit to plan participants given the institutional advantages provided to retirement plans in relation to retail investors.

182.    The share class that provides the greatest benefit to plan participants is the share class that gives plan participants access to the portfolio managers at the lowest net fee for the services of the portfolio manager and is referred to as the "Net Investment Expense to Retirement Plans."

183.    Choosing the share class that provides the lowest Net Investment

Expense to Retirement Plans is always the prudent choice because, all else being equal, the use of the share class that provides the lowest Net Investment Expense to Retirement Plans will result in one of the following superior options: (1) The amount of the fee extraction to cover the RK&A fee will be lower; or (2) the amount of excess revenue being credited back to participant accounts is greater.

184.   During the Class Period, Defendants knew or should have known that they were required to select the share classes that provided the greatest benefit to plan participants, i.e., the lowest Net Investment Expense to Retirement Plans.

185.   During the Class Period, Defendants knew or should have known that it must engage in an objectively reasonable search for and selection of the share classes that provide the greatest benefit to plan participants, i.e., the lowest Net Investment Expense to Retirement Plans.

186.   During the Class Period, Defendants did not use share classes that provided the greatest benefit to Plan Participants in at least two instances.

187.   During the Class Period, Defendants did not engage in an objectively reasonable search for and selection of the share classes that provided the greatest benefit to Plan Participants, i.e., the lowest Net Investment Expense to Retirement Plans.

188.   During the Class Period, Defendants imprudently and disloyally provided Participants more expensive share classes of the mutual funds, even though the materially identical investments were available to the Plan at much lower costs.

189.   Illustrating Defendants' breaches of their fiduciary duties, Defendants could have chosen the following mostly passive materially identical investments and effectuated millions of dollars of savings:

| Current Plan Mutual Fund | Expense Ratio | Plan's Fee | Materially Identical Lower-Cost Mutual Fund | Expense Ratio | Materially Identical Fund Fee | Plan's Excess |
|---|---|---|---|---|---|---|
| AmFunds EuroPac Growth R6 | 0.46% | $200,271.42 | Vanguard Total International Stock Index | 0.11% | $47,890.99 | $152,380.43 |
| Columbia Dividend Income Fund Inst | 0.67% | $335,355.15 | Vanguard Value Index I | 0.04% | $20,021.20 | $315,333.95 |
| Fidelity Growth Company K6 | 0.45% | $393,541.20 | Vanguard Growth Index Institutional | 0.04% | $34,981.44 | $358,559.76 |
| Undiscovered Managers Behavioral Value R6 | 0.86% | $85,582.38 | Vanguard Small Cap Value Index Adm | 0.07% | $6,966.01 | $78,616.37 |
| American Funds Tgt Date 2010 R6 | 0.30% | $35,393.27 | Fidelity Freedom 2010 Indx Premier | 0.06% | $7,078.65 | $28,314.62 |
| American Funds Tgt Date 2015 R6 | 0.30% | $24,143.26 | Fidelity Freedom 2015 Indx Premier | 0.06% | $4,828.65 | $19,314.61 |
| American Funds Tgt Date 2020 R6 | 0.31% | $162,400.09 | Fidelity Freedom 2020 Indx Premier | 0.06% | $31,432.28 | $130,967.81 |
| American Funds Tgt Date 2025 R6 | 0.33% | $182,544.16 | Fidelity Freedom 2025 Indx Premier | 0.06% | $33,189.85 | $149,354.31 |
| American Funds Tgt Date 2030 R6 | 0.35% | $349,731.63 | Fidelity Freedom 2030 Indx Premier | 0.06% | $59,953.99 | $289,777.64 |
| American Funds Tgt Date 2035 R6 | 0.37% | $220,157.43 | Fidelity Freedom 2035 Indx Premier | 0.06% | $35,701.20 | $184,456.23 |
| American Funds Tgt Date 2040 R6 | 0.38% | $317,783.61 | Fidelity Freedom 2040 Indx Premier | 0.06% | $50,176.36 | $267,607.25 |
| American Funds Tgt Date 2045 R6 | 0.39% | $257,393.19 | Fidelity Freedom 2045 Indx Premier | 0.06% | $39,598.95 | $217,794.24 |
| American Funds Tgt Date 2050 R6 | 0.39% | $252,241.03 | Fidelity Freedom 2050 Indx Premier | 0.06% | $38,806.31 | $213,434.72 |
| American Funds Tgt Date 2055 R6 | 0.39% | $123,626.13 | Fidelity Freedom 2055 Indx Premier | 0.06% | $19,019.40 | $104,606.73 |
| American Funds Tgt Date 2060 R6 | 0.40% | $54,658.52 | Fidelity Freedom 2060 Indx Premier | 0.06% | $8,198.78 | $46,459.74 |
| Fidelity Freedom Inc K | 0.42% | $10,642.32 | Fidelity Freedom Income Indx Premier | 0.06% | $1,520.33 | $9,121.99 |
| Fidelity Puritan K | 0.43% | $84,075.89 | Vanguard Growth Index Institutional | 0.04% | $7,821.01 | $76,254.88 |
| BlackRock Strategic Income Opps Portfolio Instl | 0.76% | $35,920.64 | Vanguard Multi-Sector Income Bond Adm | 0.03% | $1,417.92 | $34,502.72 |
| PIMCO Total Return Inst | 0.47% | $301,866.67 | Vanguard Total Bond Marlet Index I | 0.04% | $22,479.43 | $279,387.24 |
| | TOTAL: | $3,596,626.51 | | TOTAL: | $640,381.29 | $2,956,245.22 |

190.   Further illustrating Defendants' breaches of their fiduciary duties, Defendants could have chosen a blended portfolio of active and passive investments, it still would have amounted to millions of dollars of savings each year:

| Current Plan Mutual Fund | Expense Ratio | Plan's Fee | Materially Identical Lower-Cost Mutual Fund | Expense Ratio | Materially Identical Fund Fee | Plan's Excess |
|---|---|---|---|---|---|---|
| AmFunds EuroPac Growth R6 | 0.46% | $200,271.42 | Vanguard International Growth Adm | 0.32% | $139,319.25 | $60,952.17 |
| Columbia Dividend Income Fund Inst | 0.67% | $335,355.15 | Columbia Dividend Income Fund Inst3 | 0.56% | $280,296.84 | $55,058.31 |
| Fidelity Growth Company K6 | 0.45% | $393,541.20 | Vanguard Growth Index Institutional | 0.04% | $34,981.44 | $358,559.76 |
| Undiscovered Managers Behavioral Value R6 | 0.86% | $85,582.38 | DFA US Small Cap Value I | 0.30% | $29,854.32 | $55,728.06 |
| American Funds Tgt Date 2010 R6 | 0.30% | $35,393.27 | Fidelity Freedom 2010 Indx Premier | 0.06% | $7,078.65 | $28,314.62 |
| American Funds Tgt Date 2015 R6 | 0.30% | $24,143.26 | Fidelity Freedom 2015 Indx Premier | 0.06% | $4,828.65 | $19,314.61 |
| American Funds Tgt Date 2020 R6 | 0.31% | $162,400.09 | Fidelity Freedom 2020 Indx Premier | 0.06% | $31,432.28 | $130,967.81 |
| American Funds Tgt Date 2025 R6 | 0.33% | $182,544.16 | Fidelity Freedom 2025 Indx Premier | 0.06% | $33,189.85 | $149,354.31 |
| American Funds Tgt Date 2030 R6 | 0.35% | $349,731.63 | Fidelity Freedom 2030 Indx Premier | 0.06% | $59,953.99 | $289,777.64 |
| American Funds Tgt Date 2035 R6 | 0.37% | $220,157.43 | Fidelity Freedom 2035 Indx Premier | 0.06% | $35,701.20 | $184,456.23 |
| American Funds Tgt Date 2040 R6 | 0.38% | $317,783.61 | Fidelity Freedom 2040 Indx Premier | 0.06% | $50,176.36 | $267,607.25 |
| American Funds Tgt Date 2045 R6 | 0.39% | $257,393.19 | Fidelity Freedom 2045 Indx Premier | 0.06% | $39,598.95 | $217,794.24 |
| American Funds Tgt Date 2050 R6 | 0.39% | $252,241.03 | Fidelity Freedom 2050 Indx Premier | 0.06% | $38,806.31 | $213,434.72 |
| American Funds Tgt Date 2055 R6 | 0.39% | $123,626.13 | Fidelity Freedom 2055 Indx Premier | 0.06% | $19,019.40 | $104,606.73 |
| American Funds Tgt Date 2060 R6 | 0.40% | $54,658.52 | Fidelity Freedom 2060 Indx Premier | 0.06% | $8,198.78 | $46,459.74 |
| Fidelity Freedom Inc K | 0.42% | $10,642.32 | Fidelity Freedom Income Indx Premier | 0.06% | $1,520.33 | $9,121.99 |
| Fidelity Puritan K | 0.43% | $84,075.89 | Fidelity Puritan K6 | 0.32% | $62,568.11 | $21,507.78 |
| BlackRock Strategic Income Opps Portfolio Instl | 0.76% | $35,920.64 | Columbia Strategic Income Inst3 | 0.58% | $27,413.12 | $8,507.52 |
| PIMCO Total Return Inst | 0.47% | $301,866.67 | Vanguard CORE Bond | 0.10% | $64,226.95 | $237,639.72 |
| | TOTAL: | $3,596,626.51 | | TOTAL: | $1,137,463.31 | $2,459,163.20 |

191.   These lower-cost share classes of the materially identical mutual funds along with other substantially identical funds were available to the Plan during the Class Period.

192.   Plan Participants thus paid far higher fees than they should have, which resulted in receiving lower returns on their retirement investments, and fewer

retirement assets to build for the future, than they would have obtained had Defendants performed their fiduciary duties.

193.   Because Defendants imprudently and disloyally provided Participants the much more expensive versions of the Plan's same mutual fund options during these dates, Plan Participants lost over $10 million of their retirement savings through unnecessary expenses.

### Excessive Recordkeeping and
### Administrative Services ("RK&A") Fees

194.   Fidelity   Investments   Institutional   ("Fidelity")   is   the   Plan's Recordkeeper.

195.   Fidelity receives RK&A fees for its recordkeeping and administrative services.

196.   As of December 13, 2021, Fidelity received $46 per Plan Participant as RK&A fees.

197.   Those fees and the fees collected by Fidelity for the entire Class Period far exceed reasonable fees that were easily obtainable by the Plan in the market.

198.   At all relevant times, the Plan's fees were excessive when compared with other comparable 401(k) Plans offered by other sponsors that had similar numbers of plan participants, and similar amounts of money under management.

199.   The fees were also excessive relative to the RK&A services received.

200.   These excessive fees led to lower net returns than participants in comparable 401(k) plans enjoyed.

201.   During the Class Period, Defendants breached their duties owed to the

Plan, to Plaintiff, and all other Plan participants, by: (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment share class was prudent, in terms of cost; (2) maintaining certain share classes in the Plan despite the availability of materially identical or substantially similar investment options with lower costs and/or better performance histories; and (3) by failing to monitor the RK&A fees paid by the Plan to ensure that they were objectively reasonable and, as a result, authorizing the Plan to pay objectively unreasonable and excessive RK&A fees, relative to the RK&A services received.

202.    Defendants' mismanagement of the Plan, to the detriment of Plan Participants and beneficiaries, breached the fiduciary duties of prudence and loyalty in violation of 29 U.S.C. § 1104.

203.    Recordkeeping is a service necessary for every defined-contribution plan.

204.    The market for recordkeeping services is highly competitive.

205.    There are numerous recordkeepers in the marketplace who are capable of providing a high level of service to a jumbo, defined-contribution plan, like the Plan, and will readily respond to a request for proposal.

206.    These recordkeepers primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

207.    The cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account.

208.    Thus, the cost of providing recordkeeping services to a participant with

a $100,000 account balance is the same for a participant with $1,000 in her retirement account.

209.   Plans with large numbers of participants can take advantage of economies of scale: a plan with 10,000 participants can negotiate a much lower per participant fee for recordkeeping services than a plan with 500 participants.

210.   Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined-contribution plans negotiate recordkeeping fees on the basis of a fixed-dollar amount per participant in the plan rather than as a percentage of plan assets.

211.   Otherwise, as plan assets increase, such as through participant contributions or investment gains, the recordkeeping compensation increases without any change in the recordkeeping and administrative services, leading to excessive fees.

212.   Mutual funds have thousands of shareholders and the expense ratio for those funds includes within it a portion for recordkeeping those thousands of shareholders' accounts.

213.   But, since a 401(k) plan invests in a mutual fund as a single investor, the mutual fund has only one account to recordkeep.

214.   The plan recordkeeper tracks the account of each plan participant.

215.   In these circumstances, some mutual funds engage in a practice known as revenue sharing.

216.   In a revenue-sharing arrangement, a mutual fund or other investment

vehicle directs a portion of the annual expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's recordkeeper putatively for providing recordkeeping and administrative services for the mutual fund.

217.   Because revenue sharing arrangements provide asset-based fees, prudent fiduciaries must monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation.

218.   A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue-sharing payments that exceed a reasonable, flat, per-participant recordkeeping fee that can be obtained from the recordkeeping market through competitive bids.

219.   Because revenue sharing payments are asset based, they can provide excessive compensation as investment assets increase (such as through participant contributions or investment gains) without any change in recordkeeping services.

220.   To ensure that RK&A fees are and remain reasonable for the services provided, prudent fiduciaries of large defined-contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years, and monitor recordkeeping costs regularly within that period.

221.   In order to make an informed assessment as to whether a recordkeeper is receiving no more than reasonable compensation for the services provided to a plan, the responsible fiduciary must identify *all* fees, including recordkeeping fees and other sources of compensation, paid to the service provider.

222.    Upon information and belief, Defendants failed to conduct a competitive bidding process for the Plan's recordkeeping services.

223.    A competitive bidding process for the Plan's recordkeeping services would have produced a reasonable recordkeeping fee for the Plan long ago.

224.    By failing to engage in a competitive bidding process for the Plan recordkeeping fees, Defendants caused the Plan to pay excessive recordkeeping fees.

225.    If a defined-contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George*, 641 F.3d at 798–99.

226.    Similarly, "us[ing] revenue sharing to benefit [the plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and control recordkeeping fees" and "paying excessive revenue sharing" is a breach of fiduciary duties. *Tussey v. ABB, Inc*., 746 F.3d 327, 336 (8th Cir. 2014).

227.    Defendants failed to prudently monitor and control Vanguard's recordkeeping compensation to ensure that only reasonable fees were paid for recordkeeping and administrative services.

228.    Had Defendants ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan Participants would not have lost millions of dollars in their retirement savings through unreasonable recordkeeping and administrative fees.

229.    Compared to the $46 per-Participant, per-annum RK&A fee charged to the Plan Participants as of December 2021, other similarly situated plans received

39

substantially materially identical services for much less:

| Plan | Participants | Assets | RK&A Price | RK&A Per Particpant | Recordkeeper |
|---|---|---|---|---|---|
| Under Armour | 4,485 | $179,198,512 | $89,400 | $20 | T. Rowe Price |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,522,720,874 | $558,527 | $23 | T. Rowe Price |
| Thermo Fisher Scientific Inc. 401(K) Retirement Plan | 35,739 | $4,320,623,419 | $178,795 | $5 | T. Rowe Price |
| Cook Plan 401(K) | 12,341 | $1,193,205,473 | $567,686 | $46 | Fidelity |

230.   During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not regularly and/or reasonably assess the Plan's RK&A fees it paid to Fidelity.

231.   During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the RK&A fees it paid to Fidelity vis-à-vis the fees that other RK&A providers would charge for the same services.

232.   During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's administrative costs and RK&A fees it paid to Fidelity, but Defendants simply failed to do so.

233.   During the entirety of the Class Period, had Defendants engaged in any regular and/or reasonable examination and competitive comparison of the RK&A fees it paid to Fidelity, it would have realized and understood that the Plan was

compensating Fidelity unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and the Plan participants.

234.    The fees were also excessive relative to the RK&A services received given the services received were the normal bundle of services a plan the size of the Plan would receive.

235.    During the entirety of the Class Period, by failing to recognize that the Plan and its participants were being charged much higher administrative costs and RK&A fees than they should have been and/or by failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties to Plaintiff and the Plan participants.

236.    This breach caused Plaintiff and Class Members millions of dollars in losses to the Plan.

## Exhaustion of Administrative Remedies

237.    Plaintiff has attempted vigorously to meaningfully assert any rights afforded him and comply with any obligations incumbent upon him by the Plan.

238.    Plaintiff has, however, been prevented from meaningfully asserting his rights and discovering what, if any, further obligations he may have placed upon him.

239.    Prior to litigation, Plaintiff and those acting on his behalf, made multiple requests to Defendants and Fidelity requesting the Plan Documents and other related documents.

240.    Defendants and Fidelity refused to provide the necessary Plan

Documents and other related documents to Plaintiff.

241.   As a result, Plaintiff has not been apprised of nor afforded the opportunity to know what, if any, obligations exist under the Plan to exhaust administrative remedies.

242.   As such, Plaintiff has been denied meaningful access to administrative procedures by Defendants and Fidelity.

243.   Further, on information and belief, the relief sought herein falls outside the scope of any exhaustion requirement of the Plan.

244.   The Summary Plan Description provided to the Plaintiff, in relevant part, states:

> If your claim for a retirement benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision, without charge, and to appeal any denial, all within certain time schedules and under the Plan's claim procedures.

> Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, and you have exhausted the claims procedures available to you under the Plan, you may file suit in a state or federal court no later than three years after you have filed the initial claim for benefits. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a Domestic Relations Order, you may file suit in federal court.

> If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you

> may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

245. The information provided to Plaintiff in the Summary Plan Description plainly demonstrates that the relief sought herein is not subject to an exhaustion requirement.

246. If the Plan Documents purport to require exhaustion in order to pursue the relief sought herein, the conduct of Defendants and Fidelity in preventing Plaintiff from obtaining the relevant Plan Documents prior to initiating this litigation has waived any such requirement to exhaust under the Plan Documents.

247. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan administrator) is the same Plan administrator that made the decisions that are at issue in this lawsuit.

248. Policy supporting exhaustion of administrative remedies in certain circumstances—that the Court should review and where appropriate defer to a plan administrator's decision—does not exist here because courts will not defer to Plan administrator's legal analyses and interpretation.

249. The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

250. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a plan for breaches of fiduciary

duty.

251.    Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan.

252.    A participant's obligation—such as a requirement to exhaust administrative remedies—does not, by itself, bind the Plan.

## CLASS ACTION ALLEGATIONS

253.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

254.    In acting in this representative capacity and to enhance the due-process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) & (3), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan.

255.    Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All persons who participated in the Plan at any time during the Class Period, including any Beneficiary of a deceased person who participated in the Plan, at any time during the Class Period, and/or Alternate Payee, in the case of a person subject to a Qualified Domestic Relations Order who participated in the Plan at any time during the Class Period. Excluded from the Class are: (i) all persons who were members of the Profit Sharing Plan Advisory Committee during the Class Period; and (ii) all persons who constituted a managing officer or director for any Defendant during the Class Period.

256.    The "Class Period" runs from six years prior to the date this action was

first commenced through the date of judgment.

257.    This action meets the requirements of Federal Rule of Civil Procedure 23 and is certifiable as a class action for the following reasons:

a.    The Class includes over 12,000 members and is so large that joinder of all its members is impracticable.

b.    There are questions of law and fact common to this Class because Defendants owed fiduciary duties to the Plan and to all Participants and Beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; the amount of losses to the Plan resulting from each breach of fiduciary duty; and the appropriate Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches of their duties.

c.    Plaintiff's claims are typical of the claims of the Class because each Class Member was a participant during the Class Period and all participants in the Plan were harmed by Defendants' misconduct.

d.    Plaintiff is an adequate representative of the Class because he was a participant in the Plan during the Class Period, has no interest that is in conflict with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent attorneys to represent the

Class.

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of: (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a); and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B) of the Federal Rules of Civil Procedure.

258. A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no Class Member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule

23(b)(3) of the Federal Rules of Civil Procedure if it is not certified under Rule 23(b)(1)(A) or (B).

259.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

260.    On information and belief, no other persons who fall within the potential Class definition set forth above have initiated similar litigation, such that individual potential Class Members do not wish to control the prosecution of separate actions.

261.    This class action does not present any unique management difficulties.

## CAUSES OF ACTION

262.    The following is a non-exhaustive list of causes of action supported by the facts of this case. *King v. Kramer*, 763 F.3d 635, 642 (7th Cir. 2014). These enumerated causes of action shall not in any way limit the legal bases for liability or recovery in this case.

## COUNT I
### Breaches of Duties of Loyalty and Prudence of ERISA — RK&A Fees

263.    Plaintiff incorporates the preceding allegations as if fully set forth below.

264.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

265.    29 U.S.C. §1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan.

47

266.   Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that, like a hypothetical fiduciary, charges objectively reasonable RK&A fees.

267.   During the Class Period, Defendants had fiduciary duties to do all of the following: ensure that the Plan's RK&A fees were reasonable; manage the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

268.   During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan participants, including Plaintiff, by failing to: ensure that the Plan's RK&A fees were objectively reasonable, manage the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

269.   During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

270.   During the Class Period, Defendants breached their duty to Plan Participants, including Plaintiff, by failing to employ a prudent and loyal process by failing to critically or objectively evaluate the cost and performance of the Plan's

recordkeeper in comparison to other recordkeeping options.

271.   Through these actions and omissions, Defendants breached their fiduciary duties of prudence and loyalty with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(A).

272.   Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

273.   As a result of Defendants' breaches of their fiduciary duties of prudence and loyalty with respect to the Plan, the Plaintiff and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

274.   Defendants are liable under 29 U.S.C. §§ 1109(a) & 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count.

275.   In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) & 1132(a)(2).

## COUNT II
## Breaches of Duties of Loyalty and Prudence of ERISA — Management Fees

276.   Plaintiff incorporates the preceding allegations as if fully set forth below.

277.   Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21)

and/or 1102(a)(1).

278.   29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in managing the investments of the Plan.

279.   Defendants, as fiduciaries of the Plan, are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

280.   During the Class Period, Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

281.   During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan participants, including Plaintiff, by failing to: manage the assets of the Plan for the sole and exclusive benefit of Plan participants and Beneficiaries, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

282.   Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess whether the Plan's investments and share classes were prudent choices for the Plan and to remove imprudent investment options regardless of how long said investments had been in the Plan.

283.   During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan participants, including Plaintiff, by failing to engage

in a prudent process for monitoring the Plan's investments, including share classes, and removing imprudent ones within a reasonable period.

284.   Defendants failed to employ a prudent and loyal process by failing to critically or objectively evaluate the cost and performance of the Plan's investments and fees associated with share classes in comparison to other investment options. Defendants selected and retained for years as Plan investment options mutual fund share classes with high expenses relative to other investment options that were readily available to the Plan at all relevant times.

285.   Through these actions and omissions, Defendants breached their fiduciary duties of prudence and loyalty with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(A).

286.   Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

287.   As a result of Defendants' breaches of their fiduciary duties of prudence and loyalty with respect to the Plan, the Plaintiff and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

288.   Defendants are liable under 29 U.S.C. §§ 1109(a) & 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan

any profits resulting from the breaches of fiduciary duties alleged in this Count.

289.    In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) & 1132(a)(2).

## COUNT III
## Failure to Adequately Monitor Under ERISA — RK&A Fees

290.    Plaintiff incorporates the preceding allegations as if fully set forth below.

291.  Defendants had the authority to appoint and remove members or individuals responsible for Plan RK&A fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

292.  In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan RK&A fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

293.    Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

294.    Defendants breached their fiduciary duties by, among other things:

    a.      Failing to monitor and evaluate the performance of individuals responsible for Plan RK&A fees or have a system in place for doing so, standing

52

idly by as the Plan suffered significant losses in the form of unreasonably high RK&A fees, expenses, and costs;

b.      Failing to monitor the process by which Plan Recordkeepers were evaluated and failing to investigate through competitive bidding the availability of lower-cost recordkeepers; and

c.      Failing to remove individuals responsible for Plan RK&A fees whose performance was inadequate in that these individuals continued to pay the same RK&A costs even though benchmarking and using other similar comparators would have showed that maintaining Fidelity Investments as Recordkeeper was imprudent, excessively costly, all to the detriment of the Plan and Plan Participants' retirement savings.

295.    As the consequences of the foregoing breaches of the duty to monitor for RK&A fees the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

296.    Pursuant to 29 U.S.C. §§ 1109(a) & 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan RK&A fees.

297.    In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

### COUNT IV
### Failure to Adequately Monitor Under ERISA — Management Fees

298.    Plaintiff incorporates the preceding allegations as if fully set forth below.

299.   Plaintiff restates the above allegations as if fully set forth herein.

300.   Defendants had the authority to appoint and remove members or individuals responsible for Plan investment management and were aware that these fiduciaries had critical responsibilities for the Plan.

301.   In light of this authority, Defendants had duties to monitor those individuals responsible for Plan investment management to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

302.   Defendants had a duty to ensure that the individuals responsible for Plan investment management, including the evaluation of share classes, possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

303.   Defendants breached their fiduciary duties by, among other things:

a.   Failing to monitor and evaluate the performance of individuals responsible for Plan investment management or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high expenses associated with share classes;

b.   Failing to monitor the process by which Plan investments were

54

evaluated, failing to investigate the availability through competitive bidding of lower-cost share classes; and

c.     Failing to remove individuals responsible for Plan administration whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

304.     As a result of Defendants' foregoing breaches of the duty to monitor, the Plaintiff and Plan participants suffered unreasonable and unnecessary monetary losses.

305.     Pursuant to 29 U.S.C. §§1109(a) & 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan administration.

306.     In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, on behalf of himself and the Proposed Class, respectfully prays that the Court certify the Proposed Plaintiff Class pursuant to Rules 23(a) and (b)(1), (2), & (3) of the Federal Rules of Civil Procedure and enter orders and judgments against the Defendants and in favor of Plaintiff and the Proposed Class in an amount that will fairly compensate them for those losses and damages they have and will sustain as a result of Defendants' wrongdoing.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and all others similarly situated, respectfully demands a trial by jury.

Respectfully submitted,

*/s/ Timothy F. Devereux*
WAGNER REESE, LLP
Timothy F. Devereux, #25250-49
Jeffrey S. Gibson, #22362-49
11939 N. Meridian St., Ste. 100
Carmel, IN 46032
(317) 569-0000
(317) 569-8088 *fax*
*TDevereux@WagnerReese.com*
*JGibson@WagnerReese.com*

*/s/ Eric S. Pavlack*
Eric S. Pavlack, #21773-49
Colin E. Flora, #29914-49
PAVLACK LAW, LLC
50 E. 91st St., Ste. 305
Indianapolis, IN 46240
(317) 251-1100
(317) 252-0352 *fax*
*Eric@PavlackLawFirm.com*
*Colin@PavlackLawFirm.com*

**Attorneys for Plaintiff and Proposed Class**